UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

YOEL BELITZ,

Defendant.

21 Cr. 693 (JSR)

## MEMORANDUM OF LAW OF THE UNITED STATES
## OF AMERICA IN OPPOSITION TO DEFENDANT
## YOEL BELITZ'S MOTION TO SUPPRESS

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

David J. Robles
Assistant United States Attorney
   *Of Counsel*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ 2

PRELIMINARY STATEMENT ........................................................................................ 3

STATEMENT OF FACTS ................................................................................................ 4

    A. The Investigation Prior to October 1, 2020 ........................................................ 4

    B. The October 1, 2020 Search Warrant and Interview ........................................ 5

    C. The Defendant's Arrest and Procedural History ............................................. 10

ARGUMENT ................................................................................................................... 10

    A. Applicable Law ................................................................................................ 10

    B. Discussion ....................................................................................................... 13

CONCLUSION ................................................................................................................ 17

## TABLE OF AUTHORITIES

*Berkemer v. McCarty*,
    468 U.S. 420 (1984)…………………………………………………………....11

*Stansbury v. California*,
    511 U.S. 318 (1994)…………………………………………………………12, 15, 16

*Tankleff v. Senkowski*,
    135 F.3d 235 (2d Cir. 1998)………………………………………………………10

*United States v. Badmus*,
    325 F.3d 133 (2d Cir. 2003)………………………………………………………12

*United States v. Deak*,
    15 Cr. 659 (JSR) (S.D.N.Y. Jan. 19, 2016)………………………………………11, 14

*United States v. Falso*,
    293 Fed. App'x 838 (2d Cir. 2008)………………………………………………..13

*United States v. Familetti*,
    878 F.3d 53 (2d Cir. 2017)………………………………………………………..12

*United States v. Faux*,
    828 F.3d 130 (2d Cir. 2016)………………………………………………………11, 14

*United States v. Kirsh*,
    54 F.3d 1062 (2d Cir. 1995)………………………………………………………12

*United States v. Mitchell*,
    966 F.2d 92 (2d Cir. 1992)………………………………………………………..11, 14, 17

*United States v. Newton*,
    369 F.3d 659 (2d Cir. 2004)………………………………………………………10, 12

*United States v. Vado*,
    87 F. Supp. 3d 472 (S.D.N.Y. 2015) (PAE)………………………………………*passim*

*United States v. Wilson*,
    2015 U.S. Dist. LEXIS 54056 (E.D.N.Y. Apr. 24, 2015)……………………………12

## PRELIMINARY STATEMENT

On October 1, 2020, following an investigation into the defendant's distribution of online child pornography, law enforcement executed a search warrant on the defendant's home aimed at seizing the defendant's electronic devices.  During the execution of that warrant, the defendant spoke to law enforcement inside his home and admitted to having previously distributed child pornography.  At no point was the defendant placed in handcuffs or physically restrained.  During the conversation, the defendant was repeatedly told that he was not under arrest, that he was free to leave, and that he was under no obligation to answer the agents' questions.  The defendant chose to answer their questions anyway and, despite the defendant's confessions, he was not taken into custody that day.  Instead, the defendant stayed home with his family and was not arrested until approximately three months later, when he was permitted to self-surrender.

The defendant now argues that his statements should be suppressed because they were the product of an unlawful custodial interrogation, having not been provided a *Miranda* warning.  The defendant is wrong.  Indeed, based on the undisputed facts before the Court, the defendant cannot satisfy the multi-step inquiry required to prevail on his motion.  First, he was not in custody and, based on the totality of the circumstances, a reasonable person would have felt free to leave at any time.  Second, a reasonable person in the defendant's position would also not have believed that his freedom was curtailed in a manner similar to a formal arrest.  And the defendant's reliance on his belief that he had no choice but to answer the agents' questions is misplaced, since the question of whether a defendant is in custody for purposes of *Miranda* is a purely objective inquiry.

Accordingly, and for the reasons set forth below, the defendant's motion to suppress should be denied without a hearing.

**STATEMENT OF FACTS**

### A.  The Investigation Prior to October 1, 2020

Starting in or around April 2020, law enforcement began using an undercover online account ("UC Account-1") on a website called "LiveMe" to interact with other LiveMe users, including by participating in group and direct message chats with LiveMe accounts involved in exchanging child pornography.  Law enforcement observed that certain LiveMe groups were being used to exchange several thousand files containing child pornography either directly in chats or by posting links to cloud file hosting services such as Dropbox or mega.nz.  Some of those LiveMe groups included titles such as "Wonderland," "LoveCP," and "Lil ones! Trades."

Between in or around June 2020 and in or around July 2020, law enforcement used UC Account-1 to access the LiveMe group "Wonderland."  During that time period, law enforcement observed that a particular LiveMe account with the username "Ericsmith6969"—which was later determined to be used by the defendant—had posted multiple links to the "Wonderland" group, which contained hundreds of files of child pornography.  The files consisted primarily of images and videos of nude prepubescent children in sexually explicit poses, as well as images depicting the rape and other sexual assaults of prepubescent children.   The links contained folders with names such as "kids videos" and "yng girls."

On or about July 18, 2020, law enforcement observed that the "Ericsmith6969" account posted a link to a folder with the Russian title "видео."   The folder contained approximately 91 videos primarily depicting nude prepubescent children in sexually explicit poses and/or being sexually assaulted by adult males.  Law enforcement used UC Account-1 to exchange the following direct messages with the "Ericsmith6969" account:

4

| UC Account-1: | Hey is that Russian site safe? |
| Ericsmith6969: | Yes |
| UC Account-1: | Good stuff in there. Thx for sharing. Age you into? |
| Ericsmith6969: | Teens |

Law enforcement subsequently obtained the subscriber information for the "Ericsmith6969" account, which listed the defendant's date of birth and a phone number registered under the name of the defendant's father. In addition, certain IP addresses used to log in to the "Ericsmith6969" account came back to the defendant's home address. Based on these facts, as well as additional investigation, law enforcement determined that the defendant was the likely user of the "Ericsmith6969" account, and that the defendant was the individual distributing the hundreds of files containing child pornography described above.[1] During the investigation, law enforcement also learned, based on the defendant's publicly available Facebook page, that he had previously been employed as a camp counselor for children.

### B. The October 1, 2020 Search Warrant and Interview

On or about September 30, 2020, based in part on the information described above, the Honorable Robert W. Lehrburger, United States Magistrate Judge, Southern District of New York, issued a search warrant for the defendant's home in the Bronx, New York. That search warrant authorized law enforcement to enter the defendant's home and seize, among other things, electronic devices used to access, transmit, or store information relating to the possession, receipt, and distribution of child pornography.

---

[1] On or about September 15, 2020, the Honorable Katharine H. Parker, United States Magistrate Judge, Southern District of New York, issued a search warrant for the contents of the "Ericsmith6969" account described above. The contents of that account reflect, among other things, the chats with UC Account-1.

On October 1, 2020, members of the Federal Bureau of Investigation's Violent Crimes Against Children and Human Trafficking Task Force ("C-20") executed the search warrant on the defendant's home.  Following standard law enforcement protocol aimed at ensuring officer safety and preventing the destruction of or tampering with evidence, law enforcement agents arrived early in the morning and announced their presence.  After being let into the home, the agents conducted a standard safety sweep to identify and locate all of its occupants, including the defendant.  Shortly thereafter, two agents from C-20—Special Agent Michael Buscemi and Special Agent Aaron Spivack—escorted the defendant, who was visibly distressed, to a room inside his home for the purpose of interviewing him.[2]  At no point was the defendant or anyone else physically restrained.

Once inside the room, and prior to asking the defendant any questions, the agents asked the defendant if he preferred to have the door open or closed and, if he was cold, whether he wanted to grab any other clothing.  (Tr. at 2.)  The defendant told the agents that he did not care if the door remained open or closed.  (*Id.*)  The agents then told the defendant that he was not in trouble and that nobody was under arrest, and that if he needed to use the bathroom, get water or a snack, or get more clothes, to let them know.  (*Id*. at 3-4.)  The defendant then acknowledged that he understood he was not under arrest.  (*Id*. at 4.)  After asking the defendant what time he needed to leave for his psychology class, the agents asked the defendant, "[d]o you mind talking to us for a little bit before [] you get ready for that?  Is that okay?"  (*Id.*)  The defendant responded, "Yeah."

---

[2] Law enforcement's interview of the defendant was audio recorded.  The Government provided a copy of that audio recording to the Court during the December 9, 2021 pretrial conference.  The defendant provided a certified transcript of the audio recording to the Court during that conference as well.  For ease of reference, the transcript shall be cited herein as "Tr."  To the extent there is any ambiguity or inconsistency between the audio recording and the transcript, however, the Government respectfully requests that the Court rely on the audio recording itself.

(*Id*.)    The agents then once again told the defendant that he was not under arrest and, acknowledging that the defendant was scared, attempted to assure him that "nobody's in trouble" and that if the defendant needed anything, to let them know.  (*Id*. at 5-6.)    After asking the defendant whether everything was alright, the defendant told the agents, "Yeah, we're good." (*Id*. at 6.)  The agents' tones throughout this exchange were calm and respectful.

The agents then told the defendant that he was "not a bad person" and that he was free to leave.  (Tr. at 8-9.)  Specifically, the defendant was told,

> "Yoel, listen.  You're free to leave.  You're not in trouble.  If we thought you were a bad person, you wouldn't be free to leave.  Do you understand that?  Do you understand what I'm saying?  If we thought you were a bad person, right now - - Yoel, Yoel, if you said, guys, I want to go for a walk, I want to go for a run, I want to drive across town; you can do that.  You know that. . . . If you were a bad person, we would not let you. . . . Yoel, Yoel.  It's okay.  What I think you need to do is take a second, take a breath."

(*Id*. at 9.)  Recognizing that the defendant was distressed and scared, the agents attempted to guide the defendant through breathing exercises and told him that they wanted to make sure he was "okay physically, you know, mentally as well."  (*See id*. at 9-12.)  The defendant then told the agents, "Okay, I'm calm."  (*Id*. at 11.)   The agents then explained to the defendant that they were there to execute a search warrant relating to child pornography and that "the people we think are monsters, we don't talk [to] like this. . . . People that we think are monsters are in handcuffs the second we come in the door."  (*Id*. at 12-13.)

The agents then told the defendant that they knew he had been trading child pornography, but "what we don't know . . . is whether or not you were abusing kids, you're sexually abusing kids. . . . We don't know that.  That's why we have to make sure.  Okay?"  (Tr. at 14.)  At no point did the agents tell the defendant that they thought he had sexually abused a child.  Instead, the

agents explained, "Our job is to determine whether you're the guy who just is doing some shit he knows he shouldn't be doing or you're raping a kid." (*Id*. at 15-16.)  The agents explained to the defendant the importance of answering the agents' questions truthfully, because not doing so was a crime and could cause them to disbelieve the defendant's response if he was later asked whether he had abused a child.  (*Id*. at 17-22.)  Once again, throughout this exchange, the agents' tones were calm, courteous, and respectful.

The defendant then told the agents that he did not want his parents to think badly of him. (Tr. at 20-22.)  The defendant went on to tell the agents, "I'm scared that if I tell you everything that – without a lawyer, that I may get myself into more trouble. . . . I know you know; but I  just have this notion that I need . . . someone, an advocate."  (*Id*. at 22-23.)  In response, the agents politely told the defendant, "You can do whatever you want." (*Id*. at 23.)  The defendant expressed to the agents that he had never hurt anyone, was in a nursing program, and that he had worked as an EMT, but that it was "all over now." (*Id*. at 24-25.)  Again, trying to assure the defendant that he was not under arrest, the agents responded, "Yoel, are you in handcuffs? . . . You're not in handcuffs.  Okay?" (*Id*. at 25-27.)  Then, after answering questions about one of his electronic devices, the defendant asked, "do I need a lawyer?" (*Id*. at 31.)  The agents responded, "We're taking it regardless. . . . We can't advise one way or the other, okay?" (*Id*.)  The defendant then continued speaking with the agents, who told the defendant, "[Y]ou can do whatever you want. You are under no obligation to talk to us today.  You know that." (*Id*. at 33.)  After additional discussion about the reason for the interview, the defendant told the agents, "Okay, I'll talk." (*Id*. at 34.)  In response, the agents said, "No, no, you do whatever you want. . . . Whatever you want." (*Id*. at 35.)

8

The defendant told the agents, "I just – I don't know what to do. . . . I'm not a lawyer." (*Id*. at 35.)  In response, the agents told the defendant,

> "Neither are we. . . . How's this?  Let me – do you want me to ask you a couple questions?  If you're comfortable answering them, you answer them.  If you're not, next question.  . . . You want to do it that way? . . . [S]o if he asks you a question that you don't like, don't [lie] to him about it. . . Just say, next question.  And if you want to stop, you say stop.  That's it.  If you say no more questions, no more questions.  . . . Is that fair?"

(*Id*. at 35-36.)   Throughout that exchange, the defendant repeatedly acknowledged that he understood and was "okay" with answering the agents' questions in that manner.  (*Id*.)

Thereafter, the defendant answered several questions regarding his use of LiveMe, his viewing and distribution of child pornography, and the various electronic devices that he used. (*See* Tr. at 36-113.)  Throughout the conversation, the agents remained calm and respectful. (*See id*.)   The defendant admitted, in sum and substance, that he was the user of the "Ericsmith6969" account, that he had posted the links described above, and that he knew the links contained child pornography.  (*See generally id*.)  Towards the end of the conversation, the agents once again told the defendant, "you're not getting arrested today," and the defendant responded, "I know."  (*Id.* at 122.)

The interview with the defendant lasted approximately one hour and 24 minutes.  At no point did the agents raise their voices at the defendant, tell him that he could not leave, or threaten to place him under arrest.  After law enforcement finished executing the search, they left the defendant's home with multiple electronic devices.  No one was arrested that day.

## C. The Defendant's Arrest and Procedural History

Following the execution of the search, law enforcement reviewed the electronic devices seized from the defendant's home and identified numerous images and videos containing child pornography. On January 15, 2021, the defendant was charged by complaint with one count of distribution of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(B), (b)(1), and 2, and one count of possession of child pornography, in violation of 18 U.S.C. §§2252A(a)(5)(B), (b)(2), and 2. After discussion with counsel, the defendant was permitted to self-surrender and did so on January 19, 2021. The defendant was presented that day and was released on an agreed-upon bail package. *See* ECF No. 5.

Following the defendant's presentment, numerous orders of continuance were granted while the parties discussed a potential disposition. *See* ECF Nos. 8, 12, 13, 15, 16, 18-21. On November 10, 2021, the defendant agreed to waive indictment and proceed by Information charging the defendant with the same crimes contained in the Complaint. *See* ECF Nos. 23, 24.

## ARGUMENT

### A. Applicable Law

Under the Fifth Amendment, a suspect is entitled to a *Miranda* warning only if he or she is interrogated while in custody. *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998). To determine whether a person is in custody for *Miranda* purposes, courts in this Circuit conduct a two-step inquiry. First, courts must consider whether a reasonable person would have thought he was free to leave the law enforcement encounter. *See United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). In evaluating this question, courts examine the totality of the circumstances. *Tankleff*, 135 F.3d at 243-44. Courts look to factors including "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone

10

used by [law enforcement]; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." *Id.* at 244 (internal citations omitted).   Indeed, as this Court has recognized, "what's important is [whether] agents [were] dealing with [the defendant] in [a] really quite calm, exemplary fashion, and he clearly understood the words and the meaning of the words." *United States v. Deak*, 15 Cr. 659 (JSR) (S.D.N.Y. Jan. 19, 2016), Dkt No. 13, at 80.  Moreover, because this is an objective inquiry, "an individual's subjective belief about his or her status generally does not bear on the custody analysis." *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016).

If a court concludes based on this first step that a reasonable person would not have felt free to leave, it proceeds to the second, and determinative, question of whether, "in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Newton*, 369 F.3d at 672.  In assessing this question, the Supreme Court has directed that courts consider whether a reasonable person would have understood that his detention was not likely to be "'temporary and brief'" and whether a person stopped under the circumstances at issue would feel that he was "'completely at the mercy of the police.'"   *Id.* at 676 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984)). Importantly, the Second Circuit has noted that, "in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992).

Absent a formal arrest, courts in the Second Circuit "rarely conclude" that a suspect questioned at home is in custody for *Miranda* purposes.  *Faux*, 828 F.3d at 135-136 (suspect was not in custody when questioned at home for two hours while agents executed search warrant where she was told she was not under arrest, questioning was "largely conversational," and agents did

11

not show firearms or make threats); *see also United States v. Familetti*, 878 F.3d 53, 60-62 (2d Cir. 2017) (defendant was not in custody when questioned in his home and told he was not under arrest); *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (defendant was not in custody despite being asked by agents to remain seated in his living room, where agents told him that he wad not under arrest and that agents would leave if defendant asked); *but see Newton*, 369 F.3d at 676 (defendant was in custody in his home when placed in handcuffs). Indeed, "only in extreme or unusual circumstances have courts held that suspects interrogated in their homes were restricted to a degree comparable to that of an individual placed under formal arrest." *United States v. Vado*, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) (PAE) (citing cases in which suspects were handcuffed or told that they were not free to leave). Moreover, law enforcement does not place someone in custody merely by forbidding them entry to a specific location, where the subject is otherwise free to come and go. *See United States v. Kirsh*, 54 F.3d 1062, 1068 (2d Cir. 1995) (suspect was not in custody where only restraint imposed on her was that she was not permitted to enter her apartment while search was conducted).

On a motion to suppress, a criminal defendant bears the initial burden of establishing the basis for the motion—here, that the defendant was subjected to custodial interrogation. *See United States v. Wilson*, No. 14 Cr. 0346, 2015 U.S. Dist. LEXIS 54056, at *21 (E.D.N.Y. Apr. 24, 2015) (collecting cases). As set out above, the inquiry is an objective one, and it is irrelevant whether or not the defendant believed he was, or would be, under arrest. *Stansbury v. California*, 511 U.S. 318, 323 (1994) ("[D]etermination of custody depends on the objective circumstances . . . not on the subjective views harbored by either the interrogating officers or the persons being questioned."); *see also United States v. Falso*, 293 Fed. App'x 838, 839 (2d Cir. 2008) (the

12

defendant's subjective belief that he would be arrested because officers found a box of child pornography in his room was not sufficient to establish a custodial situation).

## B. Discussion

Law enforcement's interview of the defendant inside his home was not a custodial interrogation and thus did not require the agents to have provided the defendant with *Miranda* warnings. Indeed, under prevailing law in this Circuit, the defendant cannot satisfy either part of the two-step inquiry required to find that he was in custody for *Miranda* purposes.

To start, the circumstances of the defendant's interaction with the agents during the execution of the search warrant would not have led a reasonable person to conclude that he was not free to leave. As described above, the defendant was not placed in handcuffs nor was he physically restrained in any way when the agents entered his home to execute the search warrant. The defendant was peacefully escorted to a bedroom inside his own home, where Special Agents Michael Buscemi and Aaron Spivack assured him that he was not under arrest, that neither he nor his family were in trouble, and asked the defendant whether he preferred the door to the bedroom to be open or closed. From the start, the defendant was told that he was free to leave. In addition, the agents told the defendant that he was under no obligation to answer their questions. Recognizing that the defendant was scared and distressed, the agents even attempted to calm the defendant down by guiding him through breathing exercises, and assured him that he was not in trouble and that they did not believe he was a "bad person."

The audio recording of the interview makes clear that the atmosphere was not threatening, and reflects the consistently measured, respectful, and conversational tone taken by the agents throughout the interview. Simply put, there is nothing more the agents could have reasonably done to inform the defendant, or any reasonable person, that he was not under arrest. *See Deak*, 15 Cr.

13

659 (JSR), Dkt. No. 13, at 80 (denying defendant's motion to suppress statements because there was nothing else the agents "could have reasonably done to make clear to Mr. Deak that he was free to go" and "a reasonable person in his position would have understood that").  Under these circumstances, there is no doubt that a reasonable person in the defendant's position would have felt free to leave.  *See, e.g.*, *Mitchell*, 966 F.2d at 99 (holding that the fact that an interview took place in the familiar setting of the defendant's home weighed against a finding of a custodial situation); *Falso*, 293 Fed. App'x at 839 (holding that defendant was not in custody when the interview "occurred in the comfort of Falso's home, he was not handcuffed, he never indicated that he did not want to speak with the agents or that he wanted to leave, and was not told that he could not leave").

The fact that several agents participated in the search and that the defendant was separated from his family for the interview also does not necessitate a finding that the defendant was subject to a custodial interrogation.  Like in *Faux*, even though several agents participated in the execution of the search warrant, the defendant's interview was conducted "in the familiar surroundings of [his] home," he was "not handcuffed during the interrogation and was not arrested at its conclusion," the agents "did not display their weapons or otherwise threaten or use any physical force" against the defendant, and the defendant was told repeatedly that he was not under arrest. *Faux*, 828 F.3d at 138-139; *see also Deak*, 15 Cr. 659 (JSR), Dkt. No. 13 at 80 (denying the defendant's motion to suppress statements even though multiple agents participating in a search and initially handcuffing the defendant may have created "a certain aura of intimidation"); *Vado*, 87 F. Supp. 3d at 480 (rejecting the argument that an interrogation was custodial just because

14

"there were numerous agents in the apartment" and they kept the defendant "away from his girlfriend to conduct the interview").

The defendant argues that the agents' questions about whether he had ever abused a child caused him to "believe he had no choice but to respond to the accusation to avoid what in his mind would have been immediate arrest if he failed to comply," and that the agents' repeated assurances that he was not under arrest "caused him further acute anxiety and fear." Mot. at 5-6. These arguments fail for multiple reasons. First, a defendant's subjective belief as to whether he would be arrested is generally irrelevant to the inquiry at hand. *See, e.g.*, *Stansbury* 511 U.S. at 324-25. Thus, even if the defendant may have felt more anxious by the agents' repeated assurances that he was not under arrest, there is simply no support for the proposition that such repeated assurances would have caused a reasonable person to believe that they were not free to leave. To the contrary, as described above, numerous cases hold just the opposite. *See, e.g.*, *Vado*, 87 F. Supp. 3d at 479 (finding that interrogation was not custodial when conducted at defendant's home and defendant was told prior to commencing that he was not under arrest and was free to leave). Second, at no point was the defendant actually accused of raping a child. Instead, as the audio recording and the transcript make clear, the agents told the defendant that, while they knew he had exchanged child pornography, they did not know whether he had harmed a child and that one of the purposes of their questions was to make sure he had not done so. Throughout the conversation, the agents told the defendant that they did not believe he was a "bad person" or a "monster," and that he was under no obligation to answer their questions. A reasonable person in the defendant's position thus would not have believed that refusal to answer the agents' questions would have resulted in his "immediate arrest." Mot. at 5.

15

Moreover, while the agents did not have evidence that the defendant had previously harmed a child, given the defendant's prior distribution of hundreds of files of child pornography, his prior online chat with UC Account-1 referencing his preference for "teens," and the fact that he had worked at summer camp for children, the agents—as part of a federal task force whose mandate includes identifying and investigating crimes against children—were justified in asking about any potential harm to children in order to rule out that possibility with respect to the defendant. In any event, even if the agents had believed that the defendant previously harmed a child, their "subjective view of whether the defendant would be arrested is not relevant to this inquiry unless it is manifested in such a way as to impact how a reasonable person would perceive his freedom to leave." *Stansbury*, 511 U.S. at 325. Given the totality of the circumstances and the agents' repeated assurances that the defendant was not under arrest and was under no obligation to answer their questions, no reasonable person would have perceived the agents' questions as amounting to a threat of being arrested if they "failed to comply." Mot. at 5.

For similar reasons, even if this Court found that a reasonable person in the defendant's position would not have felt free to leave, the defendant cannot show that a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with a formal arrest. Indeed, there was nothing "extreme or unusual" about law enforcement's interview of the defendant that counsels in favor of finding that the defendant was "restricted to a degree comparable to a formal arrest." *Vado*, 87 F. Supp. 3d at 479. As described above, at no point was the defendant placed in handcuffs or in any way physically restrained. Instead, he was escorted to a bedroom inside his home and asked by the agents whether he preferred to leave the door open or closed. Once inside the room, the agents repeatedly told the defendant that he was not under arrest

16

and was free to leave, and they did everything they could to try to calm him.  Because the agents did not "affirmatively convey" a message that the defendant was not free to leave—to the contrary, they conveyed the opposite by their words and actions—the defendant cannot be said to have had a custodial experience.  *Mitchell*, 966 F.2d at 98.

Accordingly, the defendant was not in custody and the agents were under no obligation to provide the defendant with *Miranda* warnings.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the defendant's motion to suppress should be denied without a hearing.

Dated: New York, New York
December 23, 2021

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____
David J. Robles
Assistant United States Attorney
(212) 637-2550

17