```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
UNITED STATES OF AMERICA,            :
                                     :
           -v-                       :   21-cr-693(JSR)
                                     :
YOEL BELITZ,                         :   MEMORANDUM ORDER
                                     :
           Defendant.                :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

Yoel Belitz was charged in a two-count information with possession and distribution of child pornography. ECF No. 23. Now before the Court is Belitz's motion to suppress statements he made on the ground that he was in custody when law enforcement agents interviewed him at his home without advising him of his Miranda rights. See ECF Nos. 27-30. The Government opposes, see ECF No. 31, and Belitz replies, requesting an evidentiary hearing, see ECF Nos. 32, 35, 37. For the reasons set forth below, the Court, although not condoning several instances of concerning behavior on the part of the law enforcement agents here involved, denies the motion.

## FACTUAL BACKGROUND

The facts here pertinent are either undisputed or, where disputed, are taken most favorably to Belitz.

In a 2020 investigation into the exchange of child pornography on a website, LiveMe, law enforcement identified a particular user account that had posted multiple links to a

group that contained hundreds of files of child pornography. Using an undercover account, law enforcement then exchanged direct messages with that user account. Based on subscriber and IP information linking that account to the defendant, law enforcement then applied for and obtained a search warrant for Belitz's home, authorizing seizure of, inter alia, electronic devices used to access, transmit, or store information relating to the possession, receipt, and distribution of child pornography.

At approximately 6:00 a.m. on October 1, 2020, approximately fifteen FBI agents executed the search warrant on Belitz's home. See Belitz Decl. (ECF No. 29) at 1. The agents conducted a sweep of the house to identify all the occupants. They brought his mother, younger brother, and younger sister to the living room.

Two agents, Michael Buscemi and Aaron Spivack, took Belitz to his brother's bedroom for an interview. There is both an audio recording and transcript of the interview, both of which the Court reviewed at length.[1] In these circumstances, there is no need for an evidentiary hearing, especially since the Court credits the defendant's assertions made in his declaration

---

[1]   Citations herein are to the transcript, which, unless otherwise noted, corresponds accurately to the audio recording.

accompanying his motion. See, e.g., United States v. Caning, 968 F.2d 232, 236 (2d Cir. 1992) (holding that the district court was not required to hold an evidentiary hearing before denying a motion to suppress where the defendant's affidavit did not create a dispute over any material facts and where the factual issues the defense contended necessitated a hearing were irrelevant to the inquiry before the court).

It is undisputed that Belitz was not handcuffed or physically restrained. The interview lasted about 85 minutes. The agents asked Belitz questions for about an hour before taking a break, at which point Belitz went to the bathroom. After about five minutes, Buscemi and Spivack resumed the interview.

The agents asked Belitz at the outset if he wanted the door to the bedroom open or closed; when Belitz said he did not care, the agents left it slightly open. See Tr. 2:21-3:2. The agents said no one was under arrest, and then repeated to Belitz that he was not under arrest. See Tr. 3:12, 4:1-2. When the agents asked if he had anything to do that day, Belitz replied that he had psychology class at 11:00 a.m.; Spivack asked if Belitz would talk to them before he had to get ready for the class and Belitz agreed. See Tr. 4:5-25. The agents again repeated that

3

Belitz was not under arrest and told Belitz that he was "free to leave." See Tr. 5:2, 9:1-9.

The audio recording indicates that Belitz was upset at the beginning of the interview; he was crying and sniffling. The agents told him to take deep breaths and took deep breaths with him. See Tr. 7:11-13, 9:19-20, 10:7-20, 11:11-16. Belitz said "Okay, I'm calm." See Tr. 11:20.

The agents said they knew about the child porn, "the links," the videos, and the images. See Tr. 14:22-25. Belitz expressed that he was scared and did not want his parents to think badly of him, see Tr. 20:2-8; he also stated that "I'm scared that if I tell you everything that -- without a lawyer, that I may get myself into more trouble . . . . I know you know but . . . I just have this notion that I need . . . someone, an advocate," see Tr. 22:16-23:3. In response, the agents told Belitz "You can do whatever you want." See Tr. 23:4-11. The agents asked if Belitz had ever harmed an actual child, including whether he had touched his brother or sister or their friends. See Tr. 28:2-24. Belitz affirmatively said no, never. See Tr. 28:25-29:2.

The agents then asked about Belitz's laptop and tablet and passwords. See Tr. 30:2-31:9. Belitz asked "I don't know -- do I need a lawyer?" See Tr. 31:10-11. Belitz repeated, "I just -- I

4

don't know what to do . . . . I'm not a lawyer." See Tr. 35:7-9. The agents responded, "Neither are we . . . . How's this? Let me -- do you want me to ask you a couple questions. If you're comfortable answering them, you answer them. If you're not, next question . . . . You want to do it that way? . . . [S]o if [the other agent] asks you a question that you don't like, don't [lie][2] to him about it . . . . Just say, next question. . . . It's like a game. . . . And if you want to stop, you say stop. . . . Is that fair?" See Tr. 35:11-36:19. Belitz said "Okay." See Tr. 36:20.

The bulk of the interview involved the agents asking Belitz questions about the various websites or apps he used, his account or user information and passwords, what links he shared or images he viewed, and what electronic devices he used.

Just over an hour into the interview, Belitz asked to use the restroom, which he then did. See Tr. 102:19; Audio Recording 1:05:23. When the agents recommenced the interview after about ten minutes, Belitz asked what was going to happen to him. See Tr. 111:19-20. Spivack repeated that Belitz was not under arrest

---

[2] The transcript reads "like," but the audio recording indicates that the agent said "lie." See Audio Recording at 20:53.

and that the agents would leave. See Tr. 111:21-25. Belitz was not arrested that day.

The audio recording indicates that Belitz was sniffling or crying at times periodically throughout the interview, though he also calmly and coherently provided answers to the agents' questions or asked questions of his own. Except for the specific language the Court finds troubling, as discussed further below, the agents spoke in calm and measured tones, at a moderate volume and moderate pace.

## ANALYSIS

Belitz argues that he was in custody when the law enforcement agents interviewed him at his home without advising him of his Miranda rights, and that his statements should therefore be suppressed. See ECF No. 28.

A suspect is entitled to Miranda warnings prior to being questioned if he is interrogated while "in custody." Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998) (citing Thompson v. Keohane, 516 U.S. 99, 100-01 (1995)). The Second Circuit applies a two-step objective inquiry to determine whether a person is in custody for purposes of Miranda: (1) whether a reasonable person would have thought he was not free to leave the law enforcement encounter; and (2) if so, and in addition to not feeling free to

leave, whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004) (citing California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)). The "free to leave" inquiry is a necessary, but not determinative first step, and the second question remains the ultimate inquiry: "'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. at 670-71 (citing Beheler, 463 U.S. at 1125).

In making this inquiry, courts consider whether a reasonable person would have thought he was not free to leave based on the totality of the circumstances, including factors such as "whether a suspect is or is not told that she is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation." Tankleff, 135 F.3d at 44 (internal citations omitted). This is an objective inquiry, and a suspect's subjective belief about his status "generally does not bear on the custody analysis." United States v. Faux, 828 F.3d 130, 135 (2d Cir. 2016).

Agent Buscemi told Belitz at the outset of the interview that Belitz was free to leave. See Tr. 9:1-9. ("You're free to leave. You're not in trouble. If we thought you were a bad person, you wouldn't be free to leave. Do you understand that? Do you understand what I'm saying? If we thought you were a bad person, right now -- Yoel, Yoel, if you said, guys I want to go for a walk, I want to go for a run, I want to drive across town; you can do that. You know that.").

In terms of the location and atmosphere of the interview, Belitz was roused at 6:00 a.m. by approximately fifteen agents executing a search warrant at his home. Two agents took him into his brother's bedroom, sat two feet away from him, and proceeded to ask him questions. Buscemi and Spivack offered Belitz water and offered that he could get more clothes if he was cold. See Tr. 2:7-16, 3:5-8, 5:23-6:7, 10:20, 59:12. When he asked to use the bathroom, he was allowed to do so, though the agents asked him to leave the door slightly cracked. See Tr. 102:19-103:9. While in the bathroom, Belitz asked for tissues from his room; an agent said he was not sure there were any and said to just use toilet paper. See Tr. 103:11-23.

While the tone Buscemi and Spivack used was calm, measured, at a moderate volume and moderate pace, the Court finds some of the language they used troubling. Throughout the interview

8

Spivack repeatedly stated that they wanted to make sure that Belitz had not "raped a kid," implying that in order to make them think he did not, Belitz should keep talking to them to provide "context" -- that unless Belitz talked to them, they would come to their own conclusions (that he had raped a child). Belitz clearly, unequivocally, and consistently responded that he had not done so and never would. Nonetheless, Spivack referenced the agents' concern that Belitz had "raped a kid" at least six times throughout the interview. See Tr. 18:3-5, 19:2-7, 29:7-10, 34:22-21, 71:7-10, 116:6-8.

More troubling still is an interchange in which Spivack implies that Yoel will be lying if he answers no to the rape inquiry. See Tr. 19:2-7 ("Then when [the other agent] asked you at the end, have you ever raped a kid and you say no, he's probably going to think you're a liar. Does that make sense? Do you understand? It's like a human lie detector test."); Tr. 71:7-10 ("And that just goes to the whole end of the thing, like, how can we trust that you're not raping a kid."); Tr. 116:6-8 ("Because there's a good chance we might've said well, we can't risk that he's raping his brother and sister, so we're picking him up today."); see also Tr. 77:24-78:1 ("And would you feel comfortable taking a polygraph test that you've never sexually abused a child?"); Tr. 78:10-11 ("But you would

9

take a lie detector test?"). This technique is not unique to the agents in this case. See United States v. Familetti, 878 F.3d 53, 57 (2d Cir. 2017) (describing how an agent asked the defendant if he could help with the agents' investigation into who was "raping children"). The Court nonetheless finds it deeply troubling that the agent repeatedly made such an inflammatory accusation without any real ground for believing that any rape had occurred.

The defense argues that the psychological manipulation used by the agents was the kind of coercive tool that Miranda was concerned about. See ECF No. 28 at 4-5. However, "'[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it,' and Miranda does not reach every interview that has some coercive quality. Newton, 369 F.3d at 671 (quoting Beheler, 463 U.S. at 1124) (alteration in original).

The defense also makes arguments based on Belitz's subjective state of mind, including Belitz's belief that "[i]t was made clear that I was not free to leave," and that he "believed that [he] had to answer [the agents'] questions" because otherwise he would be immediately arrested. Belitz Decl. (ECF No. 29) at 2. Belitz also asserted that he did not believe that he could take a walk when the agents told him he could, and

that he believed the agents only told him that to calm him down. Id. at 3. While the Court finds Belitz's situation a sympathetic one, and although it is clear from his declaration that Belitz subjectively believed he was not free to leave, the custody inquiry for purposes of Miranda is an objective analysis. See Faux, 828 F.3d at 135.

The Court concludes that based on the totality of the circumstances, a reasonable person in Belitz's situation would have felt free to leave. Belitz was in his own home, was not handcuffed, and was explicitly told by the agents that he was free to leave. While the home was filled with fifteen law enforcement agents executing a search warrant, only two agents were in the room interviewing Belitz. The agents asked if he wanted the door to the bedroom where he was interviewed left open; when Belitz said he did not care, the door was left at least partly open. The agents spoke in a measured, conversational tone. The interview lasted about 85 minutes, and as soon as he asked, Belitz was allowed to go to the bathroom, even though he was asked to leave the door cracked.

"[I]n the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). Here, the agents

11

did not affirmatively convey the message that Belitz was not free to leave -- indeed, they stated the opposite -- and a reasonable person would have believed he was free to do so.

If a reasonable person under the circumstances would have thought he was free to leave, the custody inquiry for purposes of Miranda ends there. Even if, however, a reasonable person in Belitz's situation would have thought he was not free to leave, Belitz would not prevail at the second step and ultimate inquiry -- whether a reasonable person would have understood his freedom of action to be curtailed to a degree associated with a formal arrest. Newton, 369 F.3d at 670-71 (citing Beheler, 463 U.S. at 1125).

In considering this second step of the inquiry, courts consider whether a reasonable person would have understood that his detention was not likely to be "temporary and brief" and whether a person detained under such circumstances would feel as if he were "completely at the mercy" of the law enforcement agents. Newton, 369 F.3d at 675 (quoting Berkemer v. McCarty, 468 U.S. 420, 437-38 (1984)). "Relevant considerations include: (1) the interrogation's duration; (2) its location (e.g., at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons

were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." Faux, 828 F.3d at 135 (internal quotation marks and citations omitted).

As discussed above, the interview lasted approximately 85 minutes, with one break of about ten minutes, just after the hour mark, when Belitz went to the bathroom. The agents told Belitz from the outset that the interview would be of limited duration; Belitz said he had psychology class at 11:00 a.m., and Spivack asked if Belitz would talk to them before he had to get ready for the class. Tr. 4:5-25. A reasonable person would have understood that the interview would be temporary and that it would end before Belitz was supposed to get ready for class.

The interview took place in Belitz's home, in the bedroom of his younger brother. Buscemi and Spivack asked Belitz if he wanted the door open or shut; when he said he did not care, they left the door cracked. Belitz did not volunteer for the interview, though he chose to speak with Buscemi and Spivack even after they indicated that he was free to leave, that he was not under arrest, and that he did not have to talk to them. Belitz does not claim that the agents unholstered weapons or otherwise physically threatened him. Belitz was not handcuffed or otherwise restrained.

13

The Second Circuit cases considering the question rely on one or more of the following circumstances to find that a defendant questioned in his home was restricted to a degree comparable to a formal arrest: the defendant was handcuffed, the defendant was explicitly told he was not free to leave, or the agents showed their firearms or otherwise threatened or used physical force. Cf. Newton, 369 F.3d at 676; with Familetti, 878 F.3d at 60-62; Faux, 828 F.3d at 135-39; United States v. Badmus, 325 F.3d 133, 139 (2d Cir. 2003) (per curiam). None of these circumstances is present in Belitz's case.

In Newton, the court found that the defendant was in custody for purposes of Miranda despite being questioned in his home because he was handcuffed, even where the police assured him he was not under arrest and that the handcuffs were simply a safety measure. 369 F.3d at 676. Belitz was not handcuffed or otherwise restrained, and was explicitly told he was not under arrest.

In Familetti, which the court called a close case, the Second Circuit nonetheless found that the defendant, who was interviewed in his home while nine officers conducted a search, was not in custody because, although the officers initially physically restrained the defendant with handcuffs while he had a panic attack, the handcuffs were removed before the interview

occurred, and the officers advised the defendant several times that he was not under arrest and was free to leave, and the defendant did not ask to attempt to leave. 878 F.3d at 60-62. There was no indication of any physical restraint in Belitz's case, let alone handcuffs for even a portion of the time the agents were in the house, and, as in Familetti, the agents told Belitz several times that he was not under arrest and was free to leave and there was no evidence that Belitz asked or tried to leave.

In Faux, the court found that a defendant who was questioned for two hours in her home while agents executed a search warrant was not in custody, even though about a dozen agents executed the search warrant, the defendant was physically separated from her husband for the interview and was accompanied by an agent when she moved about her home, the agents never told her that she *was* free to leave, and the defendant effectively had to cancel her vacation in order to remain at the house during the search. 828 F.3d at 135-39. The court found the defendant was not in custody because she was told she was not under arrest, she was *not* told she was *not* free to leave, the tone of the questioning was conversational, the agents did not unholster their firearms, and the agents did not make threats or use any physical force. Id. Here, even though fifteen agents

15

executed the search warrant and Belitz was separated from his family members for the interview, he was told he was free to leave and that he was not under arrest, and makes no claim that the agents unholstered weapons or either used or threatened to use physical force.

Finally, in United States v. Badmus, the court found that the defendant, who was interviewed in his home, was not in custody, despite the fact that six officers conducted the search in a small apartment, the defendant was not allowed to move to other rooms in the apartment, and the agents' holstered guns visible to the defendant. In denying suppression, the court emphasized that the agents told the defendant several times that he was not under arrest and never drew their guns in the defendant's presence. 325 F.3d 133, 139 (2d Cir. 2003) (per curiam). Belitz was allowed to move from the bedroom to the bathroom, was told several times he was not under arrest, and made no claim that the agents drew their guns in his presence.

Based on this Second Circuit precedent, this Court concludes that a reasonable person in Belitz's situation would not feel restricted to a degree comparable to a formal arrest, especially where Belitz was in his own home, not handcuffed or otherwise physically restrained, and was repeatedly told he was not under arrest and was free to leave. The agents made clear

from the outset that it was temporary, and that they would only talk before Belitz went to his 11:00 a.m. class.

So, despite the Court's repugnance regarding some of the interview techniques used by the agents, the Court finds no basis for suppression.

## CONCLUSION

For the foregoing reasons, Belitz's motion to suppress is denied.

The Clerk is directed to close the entry bearing docket number 27.

SO ORDERED.

Dated: New York, NY
January 22, 2022

JED S. RAKOFF, U.S.D.J.